**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **GEORGE BESTMAN**<br>*Plaintiff,*<br><br>v.<br><br>**CITY OF PHILADELPHIA**<br>*Defendant.* | **CIVIL ACTION NO. 25-709** |

**MEMORANDUM RE: MOTION FOR SUMMARY JUDGMENT**

**Baylson, J.**                                                          **July 1, 2026**

## I.     INTRODUCTION

Plaintiff George Bestman purchased a rowhome, 2333 Watkins Street, in Philadelphia, Pennsylvania ("the Property") in September 2022.  Plaintiff purchased the Property with knowledge a make-safe permit would be required, and Plaintiff hired Leake Engineering to assist with the necessary repairs.  After a neighbor reported a collapsed rear wall to Philly311[1] on February 7, 2023, an inspector employed by Defendant City of Philadelphia's ("Defendant" or the "City") Department of Licenses and Inspections (L&I) concluded the home posed an "imminent danger" and recommended an emergency curbside demolition on February 13, 2023.  The inspector's supervisor approved the emergency curbside demolition within minutes, and the City demolished the entire property by February 17, 2023.

Plaintiff sued the City pursuant to 42 U.S.C. § 1983, alleging violations of (1) the Due Process Clause of the Fourteenth Amendment and (2) the Fourth Amendment.  ECF 15.  Presently before the Court is Defendant's Motion for Summary Judgment.  ECF 41.  The Court finds that

---

[1] Philly311 is a customer service center for non-emergency inquiries in Philadelphia, where people can submit service requests or report issues.  See https://www.phila.gov/departments/philly311/ (last visited June 30, 2026).

there are genuine disputes of material fact, and the City has not shown that it is entitled to judgment as a matter of law. Therefore, Defendant's Motion is **DENIED**.

## II.    UNDISPUTED MATERIAL FACTS

In February 2022, the rowhome located at 2333 Watkins Street ("the Property") was first cited by L&I for structural violations of the rear wall and bay, and photos show the Property's rear wall with loose and missing bricks. ECF 41-26 ("City's SUMF"), ¶¶ 1–2; see also ECF 41-1 at 5–7. At the time, the City's inspector, Michael Farley, noted that the "[r]ear walls and bay partially collapsed." City's SUMF, ¶ 1; ECF 41-1 at 3. Accordingly, L&I designated the Property as "Unsafe," posted a bright orange sticker on the window by the front door, and mailed a violation notice to the prior owner of the Property with information on how to appeal the "Unsafe" designation and/or how to remedy the violation. City's SUMF, ¶¶ 3–8. In April 2022, Anthony DiSabato, a construction plans review specialist who is licensed by the City and holds Uniform Construction Code and International Construction Code certifications, re-inspected the Property and noted it remained unsafe. City's SUMF, ¶ 9; ECF 50 ("City's Response"), ¶ 14; ECF 41-1, Exhibit A, at 3.

In September 2022, Plaintiff purchased the Property to renovate and resell it. City's SUMF, ¶ 10; City's Response, ¶¶ 1–2. As a Connecticut citizen, Plaintiff purchased the Property in "as-is" condition after seeing it in an online advertisement. City's SUMF, ¶¶ 11, 13; City's Response, ¶¶ 1–2. Prior to purchase, Plaintiff's friend, Ralph Sherman, a Philadelphia-based contractor, advised Plaintiff that a make-safe permit would be required. City's SUMF, ¶¶ 20, 28–30; City's Response, ¶ 2. On December 7, 2022, Plaintiff and Sherman applied for a make-safe permit at City Hall, and on a later visit, Sherman applied for additional permits and learned the Property had an existing make-safe violation. City's SUMF, ¶¶ 32–33, 39; City's Response, ¶¶ 3–4. Plaintiff

hired Leake Engineering to assist with the make-safe permit, and Sherman worked with Leake Engineering to prepare and submit the materials to the City.  City's SUMF, ¶ 31; City's Response, ¶¶ 4–5.

On February 7, 2023, Derrick Hicks, a neighbor located "catty corner" to the Property, called Philly311 to report that the house had "shifted," bricks were missing, and the rear wall had collapsed.  City's SUMF, ¶¶ 46–50; City's Response, ¶¶ 8–9.  Hicks testified that, in his opinion, the house appeared dangerous.  City's SUMF, ¶ 50; City's Response, ¶¶ 8–9; see also ECF 41-17, Exhibit Q ("Hicks Dep.") at 11:9-15, 12:11-24.  Hicks' report was limited to the rear of the home. City's Response, ¶ 9.   That same day, Thomas Keenan, the City's code enforcement supervisor, emailed city employees, including Stephen Gallagher, Director of Emergency Services, to initiate an inspection based on the call that the Property was "collapsing in the rear."  City's SUMF, ¶ 51; City's Response, ¶¶ 10–11.

On February 13, 2023, during an inspection of the Property, DiSabato accessed the rear of the property through an alley and a neighbor's yard near the Property's breezeway.  City's SUMF, ¶ 52; City's Response, ¶¶ 12, 14, 17.  Photos show that the loose bricks had fallen to the ground. City's SUMF, ¶ 54; see also ECF 41-2, Exhibit B.  DiSabato noted the Property had "partially collapsed rear exterior walls, main roof, interior floors and walls."  City's SUMF, ¶¶ 53–55; City's Response, ¶¶ 19–22; ECF 41-2 at 4–10.  DiSabato testified that he did not recall whether the bricks had fallen across the property line, see ECF 41-19, Exhibit S ("DiSabato Dep."), at 118:16-22, but he thought the wall could collapse onto the adjoining property, DiSabato Dep. at 95:6-19. DiSabato further noted that a tree had grown through the rear of the Property, causing a partial collapse to the rear wall and floor joists, but he did not observe damage to the front of the Property,

and he did not inspect the roof or evaluate the structural integrity of the interior. City's Response, ¶¶ 19–22.

Based upon his observations, DiSabato upgraded the building from "Unsafe" to "Imminently Dangerous" and emailed Gallagher and Bartlett Clark, the City's demolition coordinator, to request a curbside demolition of the Property. City's SUMF, ¶¶ 56, 68; City's Response, ¶¶ 45, 47. Nine minutes later, after obtaining approval from Gallagher but without reviewing DiSabato's report in the Eclipse system himself, Clark requested an emergency curbside demolition of the Property. City's Response, ¶¶ 49, 52–53. Another nine minutes later, Shaun Pflugfelder, an administrative technician who was responsible for sending out notices for demolitions, emailed city employees, "There will be an emergency curbside [demolition] today, Monday, 2/13/23 at 2333 Watkins." ECF 47-5, Exhibit 4 ("Gallagher Dep."), at 214:17–215:2. Later that day, a City employee left Plaintiff a voicemail informing him the Property would be demolished the same day. City's SUMF, ¶ 58; City's Response, ¶ 66. The voicemail instructed Plaintiff to file papers at City Hall if he wished to challenge the demolition. City's Response, ¶ 67.

The next day, February 14, 2023, the City mailed a Notice of Violation to Plaintiff's Connecticut address and issued a Notice of Demolition Permit to Thomas Curran, the contractor hired for the demolition. City's SUMF, ¶ 60; City's Response, ¶¶ 56, 58. After receiving the voicemail, Plaintiff traveled from Connecticut to Philadelphia to file a temporary restraining order in the Philadelphia Court of Common Pleas, which was denied on February 15, 2023. City's SUMF, ¶¶ 61–62; City's Response, ¶¶ 68–69; see also ECF 41-23, Exhibit W; ECF 41-24, Exhibit X. By February 17, 2023, the Property had been demolished. City's SUMF, ¶ 57; City's Response,

4

¶ 70. On February 27, 2023, Plaintiff received the notice at his Connecticut address. City's Response, ¶ 58.

### III.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must, by "citing to particular parts of materials in the record," show that a fact is "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

## IV.   LEGAL STANDARD – MUNICIPAL LIABILITY

A government entity cannot be held liable under § 1983 for the acts of its employees under *respondeat superior*.  Monell v. Dept. of Soc. Servs., 436 U.S. 658, 691 (1978).   Thus, a plaintiff must show that the government official was acting pursuant to a municipal policy or custom.  Id. at 694.   The municipality is liable when either the policy or custom facially violates the Constitution, or if not unconstitutional itself, is the "moving force" behind the constitutional violation.  Thomas v. Cumberland Cnty., 749 F.3d 217, 222 (3d Cir. 2014); see also Porter v. City of Phila., 975 F.3d 374 (3d Cir. 2020) (city cannot be liable for the unconstitutional application of a facially constitutional policy absent evidence the city had a custom of applying the policy in an unconstitutional manner).

## V.   COUNT I – FOURTEENTH AMENDMENT

### A.  Legal Standard

Before a person's property may be taken, the state must provide notice and an opportunity to be heard.  Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 795 (1983).  The Fourteenth Amendment does not require actual notice, but the notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  Jones v. Flowers, 547 U.S. 220, 226 (2006).  If the government knows that notice pursuant to its normal procedures has been ineffective, the government has an obligation to take additional steps to effectuate notice.  See id. at 229–34.

Although a hearing typically precedes the government's deprivation of an individual's property, pre-deprivation notice is not always required.  If there is either (1) necessity of quick action by the state (*i.e.*, emergency situations) or (2) conditions rendering pre-deprivation notice impractical, the state satisfies due process by "making available 'some meaningful means by which

6

to assess the propriety of the State's action at some time after the initial taking.'" Elsmere Park

Club, L.P. v. Town of Elsmere, 542 F.3d 412, 417 (3d Cir. 2008) (quoting Parratt v. Taylor, 451

U.S. 527, 539 (1981)).   The government has some leeway in deciding whether exigent

circumstances make pre-deprivation process unfeasible.   Id. at 418.   Accordingly, if there is

competent evidence that an emergency exists, only an arbitrary decision to forgo pre-deprivation

process would violate due process.   Id.; see also Dvortsova v. City of Phila., 585 F. Supp. 3d 723,

730–31 (E.D. Pa. 2022) (Pappert, J.).

### B.  Parties' Contentions

First, the City argues that Plaintiff has not shown an unconstitutional policy, practice, or

custom.   ECF 41 at 1–2, 9–11; ECF 49 at 1–2.   The City contends it fully demolishes properties

with competent evidence that the property has partially collapsed, thereby warranting an

emergency curbside demolition and excusing the City from providing owners with pre-deprivation

notice.   ECF 49 at 1–2.   Defendant argues that here, Plaintiff received pre-deprivation notice of

the demolition from the initial Notice of Violation sent to the prior owner and the voicemail left

on Plaintiff's phone on February 13, 2023.   ECF 41 at 9–11; ECF 49 at 6–7.   The City argues that

it provided Plaintiff with this notice even though the emergency situation excused any pre-

deprivation notice.   ECF 49 at 7.

However, Plaintiff argues the City applies the custom in an unconstitutional manner.   ECF

47 at 3, 23–24.   In particular, Plaintiff contends the City has a custom to fully demolish properties

without competent evidence that the entire property warrants an emergency curbside demolition,

and thus the City fails to provide constitutionally sufficient notice.   Id.   Plaintiff further argues

there is no basis in the record to conclude that the entire Property was "imminently dangerous"

and needed to be demolished on an emergency basis without providing notice.   Id. at 2.

Moreover, Plaintiff argues the City's notice procedures did not provide a meaningful opportunity to object to the demolition. Id. at 11–12. Plaintiff contends where an emergency curbside demolition begins immediately, according to City requirements, the notice sent through the mail will not give the owner sufficient notice to stop the demolition, and demolition will have started by the time an appeal is filed the next day. Id. Plaintiff argues there is a dispute here as to whether it was reasonable for the City to demolish the entire Property on an emergency basis, and whether the notice provided to Plaintiff was reasonable under the circumstances. Id. at 3–4.

## C. Discussion

There are genuine disputes of material fact concerning Plaintiff's Fourteenth Amendment claim. Specifically, the Parties disagree as to whether the City's custom to order emergency curbside demolitions without competent evidence of an emergency is unconstitutional, whether the demolition of the Property was an "emergency situation," and whether Plaintiff received proper notice. See ECF 41 at 7–11; ECF 47 at 19–27; ECF 49 at 1–2, 6–8. Thus, the Court cannot grant summary judgment for the City.

Furthermore, the City has not shown it is entitled to judgment as a matter of law. The City cites Win & Son, Inc. v. City of Phila., 162 F. Supp. 3d 449 (E.D. Pa. 2016) (McHugh, J.), Johnson v. City of Phila., No. 19-1591-KSM, 2020 WL 2933853 (E.D. Pa. June 3, 2020) (Marston, J.), and Madar v. City of Phila., No. 19-6033, 2021 WL 2156362 (E.D. Pa. May 27, 2021) (Goldberg, J.) for the proposition that the City's policies are constitutionally "adequate to ensure that property owners receive notice of any potential deprivations of a property interest." ECF 41 at 8–9; ECF 49 at 5. But in those cases, the plaintiffs failed to show an unconstitutional policy, practice, or custom. See Win & Son, 162 F. Supp. 3d at 462; Johnson, 2020 WL 2933853, at *9; Madar, 2021 WL 2156362, at *11. Indeed, the "City had sufficient guidelines in place to ensure notice was

given, and in the absence of any evidence that such guidelines were routinely ignored, then those violations did not occur *pursuant* to a policy or custom of the City." See Win & Son, 162 F. Supp. 3d at 462 (emphasis in original); see also Johnson, 2020 WL 2933853, at *10; Madar, 2021 WL 2156362, at *10 ("Absent evidence that such guidelines were routinely ignored, any isolated violation of them did not occur *pursuant* to a policy or custom … under which Monell liability can be imposed on the City.") (emphasis in original).

However, in some instances, there is a dispute as to whether the City's policies or customs are constitutionally deficient. For example, in Dvortsova, the court noted a jury could conclude there was a custom of the City "employing the curbside bid process to demolish properties without notice in the absence of an emergency," in violation of due process. 585 F. Supp. 3d at 735. The district court further noted that this custom was previously documented in two earlier cases, Gordon v. City of Phila., 2009 WL 2710247 (E.D. Pa. Aug. 28, 2009) (Tucker, J.), and Bullard v. City of Phila., 847 F. Supp. 2d 711 (E.D. Pa. 2012) (Rufe, J.), and there was evidence that this practice continued through September 2020. Dvortsova, 585 F. Supp. 3d at 735–36.

Plaintiff contends that here, there is evidence in the record that this custom of emergency curbside demolitions without evidence of an emergency and without notice continued through at least 2023, including the demolition of the Property in February 2023, as well as Gallager's testimony that L&I leaves it to the "judgment" of inspectors, without any consultation with a structural engineer, whether to order an immediate curbside demolition of a property. ECF 47 at 3, 9–11, 25–27, 28 n.4. Therefore, a reasonable jury could find that the City has an unconstitutional custom of proceeding with full demolitions without competent evidence of an emergency warranting such measures and thus does not provide constitutionally sufficient notice. See

9

Dvortsova, 585 F. Supp. 3d at 735–37.  But, as in Dvortsova, Plaintiff will need to prove the existence of this custom at trial.  See id. at 736–37.

As Judge Pappert noted in Dvortsova, the City's curbside bid process is not "inherently unconstitutional."  Id. at 737.  "When City officials reasonably conclude the property represents an immediate danger, demolition without notice is appropriate."  Id. (citing Elsmere, 542 F.3d at 418).  Consequently, the City cannot be liable for a "custom of making the decision to demolish, and then, within hours, soliciting bids from contractors and demolishing the building."  Id. (citing Bullard, 847 F. Supp. 2d at 722).  Rather, there must be evidence the City had a custom of using that procedure in circumstances where doing so "does not comport with due process."  Id.

Plaintiff argues that there is no evidence of an emergency, as the City received the Philly311 call a week prior to DiSabato visiting the Property, and Hicks testified that he did not see any further deterioration of the Property between his call and the time the house was demolished.  ECF 47 at 19–25.  Plaintiff contends this "calls into question [Mr. DiSabato's] conclusion that there was no time to notify the owner so [he] could attempt to eliminate the hazard."  Id. at 22 (alterations in original).  Plaintiff further contends the notice—a voicemail and a notice of violation that was mailed while the demolition was ongoing and arrived 2 weeks after the Property was demolished—was futile.  Id. at 19.  Like in Dvortsova, a reasonable jury could also find that here, it was unreasonable for the City to conclude that the Property was "imminently dangerous" such that it needed to be demolished on an emergency basis, and the notice given to Plaintiff was insufficient.

Accordingly, the City's Motion is **DENIED** as to Count I.

10

## VI.    COUNT II – FOURTH AMENDMENT

### A.  Legal Standard

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. The demolition of buildings in emergency situations is a valid exercise of a state's police powers. See Est. of Blose ex rel. Blose v. Borough of Punxsutawney, 889 A.2d 653, 659 (Pa. Commw. Ct. 2005).  However, seizures of private property must be reasonable, and what is reasonable depends on the context in which the seizure takes place.  New Jersey v. T.L.O., 469 U.S. 325, 337 (1985). The reasonableness inquiry requires the court to balance the private and government interests. Soldal v. Cook Cty., 506 U.S. 56, 71 (1992).

### B.  Parties' Contentions

First, Defendant argues that Plaintiff has not provided any evidence that refutes the City's finding that the building was "imminently dangerous" and required an emergency demolition. ECF 41 at 11–12.  The City argues there is extensive photographic evidence that the Property had collapsed in part and had been getting worse, as well as several expert reports and the Philly311 call from Hicks, who believed the collapse to be both imminent and dangerous.  Id.; see also ECF 49 at 8–9.  Defendant argues that, once a state-certified inspector determines a structure is "imminently dangerous," the City may fully demolish the property because the power to demolish is within the state's valid police powers.  See ECF 41 at 11; ECF 49 at 4–5, 8.  Defendant contends that partial demolitions would infringe on the City's police powers, increase costs on the City, and require the City to make repair decisions regarding owners' property.  ECF 49 at 3–4.

The City further argues that the seizure of the Property was reasonable, and "Plaintiff is making a novel argument that because the damage was likely limited to the back half of the

11

property, this either somehow entitles Plaintiff to have the City renovate Plaintiff's property for him, or that half of a building is so de minimis that it does not warrant demolishing the entire structure, neither of which is supported by law." Id. at 2. The City contends there is "no federal case law, to the knowledge of undersigned, that places an affirmative obligation on the City to only demolish half a house to make renovations easier for negligent property owners." Id.

In response, Plaintiff argues that the City's custom is to demolish entire structures even where damage was limited to one portion. ECF 47 at 9–11. Plaintiff contends that in this case, it was arbitrary and unjustified to seize the Property and demolish it on an emergency basis. Id. at 28–29. Plaintiff argues the evidence shows that only the rear addition of the Property was even arguably unsafe, but the City demolished the entirety of the Property, including the non-problematic front portion. Id. at 2, 16–17, 24–25, 28–29. Plaintiff further contends it was possible to temporarily secure the rear of the Property, which would have kept the Property safe for sufficient time to allow for reasonable notice and the opportunity to meaningfully challenge the demolition order. Id. at 24–25. Plaintiff argues the totality of the evidence establishes that there was no reasonable basis for the City to demolish the entire Property and there is a genuine dispute as to whether the seizure was reasonable. Id. at 28–29.

### C. Discussion

Like Plaintiff's Fourteenth Amendment claim, there are genuine disputes of material fact regarding Plaintiff's Fourth Amendment claim. The Parties agree that the City maintained two customs: (1) the City conducts complete demolitions of structures that are only partially collapsed; and (2) the determination of whether to demolish a building is made by state-certified residential building inspectors. ECF 49 at 1. But the Parties disagree whether the City's custom to fully demolish properties that have only partially collapsed, rather than conducting a partial demolition,

12

is constitutional.  Plaintiff argues that this custom is unconstitutional, see ECF 47 at 9–12, 24–25, and the City argues that the custom is constitutional, see ECF 49 at 1–2.  As such, the Parties also disagree on whether the full demolition of the Property was a reasonable seizure.  Plaintiff argues the full demolition of the Property was unreasonable, see ECF 47 at 28–29, and the City argues the full demolition of the Property was reasonable, see ECF 49 at 8–9.

The Philadelphia Property Maintenance Code ("PPMC") provides that L&I may (1) fully demolish, (2) partially demolish, or (3) temporarily render the structure safe.  See Phila. Code. §§ PM-110.2 (notice "specifying the required repair to render the structure safe, or requiring the imminently dangerous structure *or portion thereof* to be demolished" is required if an "imminently dangerous" condition is found) (emphasis added); PM-110.2.1 (official may take "immediate action" through an "oral order"); PM-110.4 (if notice is disregarded or immediate action is required for public safety, the code official "shall cause the necessary work to be done to demolish the structure or to render the structure temporarily safe").  However, Gallagher testified that the City never requests partial demolitions or other temporary measures to render the property safe even though the contractors have such capabilities.  City's Response, ¶ 33 (citing Gallagher Dep. at 133:23–135:24).    Moreover, Gallagher testified that he did not know of any instance where a demolition was stopped because a cost analysis said it was more expensive to demolish the property than to repair it.  Gallagher Dep. at 33:14-18.  Although no court has ruled on this issue, a reasonable jury could find that the City's custom of fully demolishing properties that have only partially collapsed, rather than conducting a partial demolition, is unconstitutional.

Furthermore, as discussed, a reasonable jury could find that it was unreasonable for the City to conclude that the Property was "imminently dangerous" such that it needed to be demolished on an emergency basis.  See Part V.C.  If Plaintiff proves this at trial, it follows that a

reasonable jury could also find that the demolition of the Property was an unreasonable seizure.

See Dvortsova, 585 F. Supp. 3d at 733.  Therefore, the City's Motion is **DENIED** as to Count II.

## VII.    CONCLUSION

An appropriate Order follows.

\\adu.dcn\paed\PHL-DATA\Judge_Baylson\CIVIL 25\25-709 Bestman v City of Phila\25-709, Memo re MSJ.docx

14